# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

Plaintiff,

v.

TORANIO HARGRAVES,

Defendant.

Criminal Action No. 22-91-GBW

---

David C. Weiss, Jennifer K. Welsh, U.S. ATTORNEY OFFICE, Wilmington, Delaware.

   *Counsel for Plaintiff*

Eleni Kousoulis, David L. Pugh, FEDERAL PUBLIC DEFENDER'S OFFICE, Wilmington, Delaware.

   *Counsel for Defendant*

## <u>MEMORANDUM OPINION</u>

July 29, 2024
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Presently before the Court is Defendant Toranio Hargraves' ("Hargraves" or "Defendant")

Motion to Suppress Evidence (D.I. 29). The Government opposes Defendant's Motion. D.I. 33.

The Court held an evidentiary hearing and heard oral argument on May 23, 2024 ("Tr."). For the

reasons set forth below, Defendant's Motion is DENIED in all respects.

## I.   BACKGROUND

On December 7, 2021, Sergeant Sean Nolan ("Nolan") of the Wilmington Police

Department ("WPD") and his State of Delaware Probation and Parole colleague, Officer Joseph

Scioli ("Scioli"), witnessed a Nissan Rogue with Maryland tags conduct an illegal left turn on a

right lane in Wilmington, Delaware. Tr. 10:23-11:14. The officers subsequently pulled the Nissan

over for making the illegal left turn. Tr. 12:7-12. Three (3) law enforcement vehicles responded

to the scene, with approximately seven (7) officers present. Tr. 40:18-23.

When Nolan and Scioli approached the vehicle, the officers witnessed Hargraves in the

driver's seat with two other passengers. Tr. 20:6-25. Nolan asked Hargraves for his license, and

Hargraves responded that he did not have his license on him. Tr. 21:5-11. Hargraves instead

provided the officers with a state-issued identification card. Tr. 21:12- 13. Nolan asked Hargraves

to roll down his rear driver's side window, and Hargraves claimed that the window was broken.

Tr. 21:23- 22:3; Ex. B at 1:40-1:48. Nolan then indicated that he would open the rear driver's side

door to see who else was in the vehicle. Tr. 21:23-22:3. Nolan claims he opened the rear driver's

side door to ensure officer safety. Tr. 22:1-3. Nolan testified that, when he opened the rear driver's

side door, he did not move away from the front driver's side door. Ex. B at 1:47. By this time, the car's three other windows were partially rolled down. Ex. B at 1:48.

Approximately thirty (30) seconds later, and while he was standing near the front driver's side door, Nolan indicated to Scioli that he smelled marijuana. Tr. 2:13-25; Ex. B at 2:16. Around the same time, another officer ran Hargraves' identifiers through Delaware's criminal justice information system, DELJIS, and found that his license was suspended. Tr. 24:19-25:15. The officer also found that Hargraves was wanted. *Id.* Nolan then asked Hargraves to step out of the car and patted him down. Ex. B at 3:25-3:50. During the pat down, Nolan asked Hargraves whether he had "any weed in the car," to which Hargraves responded "just like a little bit" before retracting his statement. Tr. 27:24-28:2; Ex. B at 3:54-4:12. The other occupants were removed from the vehicle and officers commenced a search. Tr. 28:16-28:22. Nolan asked Hargraves where the marijuana was, and Hargraves stated that they had smoked it already. Ex. B at 4:11, 4:52. However, the officer on the passenger side of the car, Scioli, found a gun, and Nolan found marijuana in the car. Tr. 29:4-12, 31:6-12 Ex. B at 5:30. The car's occupants were then handcuffed and taken into custody. Tr. 29:13-20; Ex. B at 5:40.

At the police station, Detective Gaetan MacNamara and Probation and Parole Officer Tiffani Hughes attempted to interview Hargraves, at which time MacNamara read Hargraves his *Miranda* rights. Tr. 16:4-17:17, 58:5-62:3, 60:5-8. Hargraves indicated that he did not want to speak. Tr. 61:23-25. MacNamara asked Hargraves whether Hargraves would consent to a DNA swab. Tr. 62:9-64:3. In response, Hargraves asked, "you need my DNA for what?" and MacNamara informed Hargraves that a gun was found in the car. Tr. 63:5-8. MacNamara stated that, if Hargraves did not consent to a DNA search, then the police would "type a search warrant and we'll do it that way . . . doesn't matter to me." Ex. C at 2:55. Hargraves responded, "don't

matter" and, after inquiring how to do the swab, Hargraves performed the swab and handed it back. Tr. 65:21-67:16. Of the two other passengers arrested alongside Hargraves, one consented to a DNA swab and one declined; the officers sought and obtained a warrant for a DNA search from the non-consenting passenger. Tr. 69:1-17, Ex. E.

## II.   DISCUSSION

### A. The Officers had Reasonable Suspicion to Conduct the Traffic Stop.

In support of his Motion to Suppress, Hargraves contends that the officers effected an unlawful traffic stop of the vehicle because the officers lacked reasonable suspicion to conduct the traffic stop. D.I. 29 at 5-6. Reasonable suspicion is not a high bar. D.I. 29 at 5; *Navarette v. California*, 572 U.S. 393, 397 (2014) ("Although a mere 'hunch' does not create reasonable suspicion, . . . the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause . . . .") (internal citations omitted). In the context of a traffic stop, officers may satisfy this standard by providing "the 'specific, articulable facts' to justify a reasonable suspicion to believe that an individual has violated the traffic laws." *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (internal citations omitted). In reviewing whether the facts presented by the officers warranted the stop, the Court must "weigh 'the totality of the circumstances-the whole picture.'" *Id.* (internal citations omitted).

Nolan testified that he observed Hargraves make a left-hand turn from the far-right lane. Tr. 11:2-14:2. There was no contrary testimony. Tr. 128:2. Hargraves' counsel conceded at the evidentiary hearing that "I am not alleging . . . that it was an illegal stop, merely [pretextual] because the real intent is to search the vehicle. Now, I understand that case law allows that even

4

if the intent is beyond what the stop is for that that can still be a legal stop . . . ." Tr. 128:5-10. Indeed, pretextual stops do not violate the Fourth Amendment. *See generally Whren v. U.S.*, 517 U.S. 806 (1996). Thus, the intent of the officers is irrelevant to the Court's analysis of the traffic stop, and the Court finds that Hargraves' illegal left turn provided officers with sufficient reasonable suspicion to conduct the initial stop.

### B. The Officers' Roadside Questioning of Hargraves was Non-Custodial.

Defendant contends that Hargraves was in police custody when Nolan asked Hargraves if there was marijuana in the vehicle. D.I. 55 at 1-2. The Court disagrees. Parties detained pursuant to ordinary traffic stops are not in custody for the purposes of Miranda. *Berkemer v. McCarty*, 468 U.S. 420, 437-40 (1984). During a lawful traffic stop, an officer may order the driver and any passengers out of the vehicle without any particularized suspicion. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997). An officer may commence a traffic stop for "tinted front car windows," "smell the odor of 'freshly burned marijuana,'" ask a suspect "if he had been smoking marijuana in the vehicle," and then ask "if there was any marijuana in the vehicle" without transforming a traffic stop into custodial interrogation. *See United States v. Caraballo*, 643 F. App'x 163, 166, 168 (3d Cir. 2016). As was the case in *Berkemer*, the traffic stop was relatively brief and public, which together "mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" 468 U.S. at 437.

Defendant next contends that this traffic stop was not ordinary because of (1) the presence of multiple officers and (2) Nolan's statements that there was a warrant for Hargraves and that

Hargraves lacked a driver's license.[1]   In determining whether a routine traffic stop becomes custodial, the Court must decide "how a reasonable man in the suspect's position would have understood the situation." *Berkemer*, 468 U.S. at 422. The Third Circuit precedent requires courts to weigh the following five (5) factors in determining if an interrogation is custodial:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman,* 437 F.3d 354, 359–360 (3d Cir. 2006). The number of officers may go to "coercive tactics," but the lack of other coercive tactics mitigates the impact of that factor. *See United States v. McMillan*, 227 F.Supp.3d 432, 438 n.3 (W.D. Pa. 2017) ("Defendant makes much of the fact that there were multiple officers on the scene . . . [h]owever, Defendant does not cite to any Third Circuit law that ties the relevance of such facts to the Court's analysis here. Additionally, the Court notes that leading Third Circuit opinions do not mention the number of officers present . . . .").[2]   With respect to Nolan's statement that there was a warrant out for Hargraves' arrest, this statement must be balanced with Nolan's statements that the officers were "not even necessarily going to take" Hargraves and that Hargraves would "most likely be back in the car." Ex. B at 3:28-3:38. The remainder of the factors weigh against a finding that Hargraves' questioning was a custodial interrogation: the interrogation took place in public, was brief, and appears to have been voluntary. In balancing these facts, the Court finds that Hargraves was not

---

[1] To the extent Defendant focuses on Nolan's statement to Hargraves that "I could let you go but I've got you now," Tr. 141:2-9, the Supreme Court has recognized that an inability to leave does not transform traffic stops into custodial interrogations. *Berkemer*, 468 U.S. at 436-39.

[2] The *McMillan* court found that the stop did become custodial when the defendant was handcuffed and restrained, with weapons pointed at him. 227 F.Supp.3d at 440.

in custody until he was handcuffed and arrested after officers located a gun in the vehicle. Ex. B at 5:40.

### C. The Officers had Probable Cause to Search the Vehicle.

Officers may search a car without a warrant so long as they have probable cause to believe the car contains contraband. *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002). In this matter, when officers searched Hargraves' vehicle, they knew that (1) Hargraves was driving someone else's car on a suspended license (Tr. 24:19-25:15; Ex. B at 2:00); (2) Hargraves was wanted (Tr. 24:19-25:15); (3) there was a scent of marijuana from the car (Tr. 2:13-25; Ex. B at 2:16); and (4) Hargraves had given conflicting statements about whether there was marijuana in the car (Tr. 27:24-28:2; Ex. B at 3:54-4:12). "[T]he smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ushery*, 400 F. App'x 674, 675-76 (3d Cir. 2010). In this case, the smell of marijuana was articulated, particularized, and supported by Hargraves' admission that there was marijuana in the vehicle.[3] When considered in the context of the other indicia of criminality, the smell of marijuana and Hargraves' concession were sufficient to give officers probable cause to search the vehicle for contraband.

### D. Defendant's New Arguments are Improper and Independently Fail.

Defendant argued for the first time at the evidentiary hearing that Nolan conducted a search without probable cause when he opened the driver-side rear door, and that the officers had to confirm whether any occupants of the vehicle had a medical marijuana card. *See* D.I. 29. The

---

[3] While Hargraves had not yet admitted he had been smoking marijuana, his later admission buttresses a finding that the scent of marijuana was present. Ex. B at 4:11, 4:45.

Court specifically stated that "[a]ny new arguments not included in the original briefing and/or not agreed to by counsel as fair game for assertion for the first-time during yesterday's hearing will be considered waived, untimely, or otherwise inappropriate absent compelling showing of good cause as to why such argument was not included in the original briefing." D.I .51.  Thus, Defendant's arguments raised for the first time at the hearing are waived.

Even if Defendant had not waived this argument, Defendant's claim that Nolan conducted a search by opening the rear driver side door fails as a matter of law.  Indeed, Police are permitted to require occupants to open a door to leave the vehicle. *Wilson*, 519 U.S. at 410; *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977).  Moreover, several appellate courts to consider whether officers may open car doors without violating Fourth Amendment protections have found that officers approaching vehicles with tinted windows are permitted to open a door for safety reasons, so long as the officer does not break the plane of the vehicle. *See United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1997) ("[A] contrary holding would not only be irreconcilable with, but arguably undermine altogether, the caselaw from the Supreme Court that was developed specifically for the purpose of protecting officer safety during what are, in today's society, frighteningly perilous encounters."); *U.S. v Brown*, 334 F.3d 1161, 1169-70 (D.C. Cir. 2003).  While the question of "[w]hether an officer can open a car door during a traffic stop based on less than reasonable suspicion is an open question" in the Third Circuit, the Court is not aware of any case that requires an officer approaching a vehicle with tinted windows to refrain from opening a door[4] to ensure safety. *United States v. Dowdell*, 70 F.4th 134, 144 (3rd Cir. 2023).  And the Supreme Court's holdings in *Wilson* and *Mimms*, which authorized greater intrusion on liberty based on nearly

---

[4] That the officers initially requested only that the windows be rolled down, and only opened the door once informed that the mechanism to roll down the rear window was broken, further supports a finding that the intrusion was justified by safety concerns.

identical rationale (i.e., ordering occupants out of the vehicle), control the outcome here. *See, e.g.,* *Wilson*, 519 U.S. at 414 (recognizing "traffic stops may be dangerous encounters" for officers, and "the fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer").

Even if the Court were to find that safety precautions did not justify the opening of the door, there was no fruit from the minimal intrusion. The remainder of the car's windows had already been rolled down, and Nolan was standing near an open window when he announced he smelled marijuana. Moreover, Hargraves admitted he had smoked marijuana recently—it is far more plausible that either Hargraves or the open window Nolan was standing next to was the source of the marijuana odor, rather than an open door some distance away. Thus, even if Defendant did not waive the argument that the opening of the car door was a search, and the search was unreasonable, there would still be nothing to suppress.

Defendant's argument as to the necessity of confirming the presence or absence of a medical marijuana card similarly fails. Even if the Court were to apply state law, marijuana was contraband at the time of Hargraves' arrest, at least in the presence of other indicia of criminality. *Valentine v. State*, 207 A.3d 166 (Table), 2019 WL 1178765, at *2 (Del. 2019) (rejecting an argument that decriminalization of marijuana or legalization for medical purposes renders "marijuana odors, raw or burnt, irrelevant to determinations of probable cause."). Thus, a failure to determine whether any occupant of the vehicle had a medical marijuana card would not alter the probable cause inquiry.

### E.  Hargraves Consented to the DNA Swab.

Defendant contends that his DNA was unlawfully seized when he swabbed his cheek after being asked to do so at the station.  A DNA swab is a search subject to the Fourth Amendment. *Maryland v. King*, 569 U.S. 435, 446 (2013); *see also United States v. Smith*, 575 F.Supp.3d 542, 553 (E.D. Pa. 2013) ("The Fourth, not the Fifth, Amendment instead supplies the answer."). Hargraves, when asked to swab for DNA, said "ok," swabbed his cheek, and returned the swab. Ex. D at 3:00-5:11.  The Government contends that this constituted a voluntary search.  The Government has the burden of proving by a preponderance of the evidence that consent to a search was freely and voluntarily given under the "totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973).  In applying the *Schneckloth* test, courts must consider all factual circumstances surrounding the consent, including: (1) the characteristics of the defendant, such as his youth, his level of education, and his intelligence, *id.* at 226; (2) details of the interrogation, including whether the Defendant was advised of his constitutional rights, the length of the encounter, the nature of questioning, *i.e.*, whether it was repeated and prolonged, and the use of physical punishment, which includes the deprivation of food or sleep, *id.*; (3) the psychological impact of the circumstances on the accused, *id.*; (4) the context in which consent was obtained, *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009); and, (5) any verbal or nonverbal actions by the accused and the police officer[s], *id.*  No single criterion is dispositive; all the surrounding circumstances must be considered. *Schneckloth*, 412 U.S. at 226.

In this particular case, the Court finds that Hargraves voluntarily consented to a search.  At the time of the swab, Hargraves had been in custody for approximately forty (40) minutes, had been told that the swab was voluntary, was not handcuffed, and had successfully invoked his *Miranda* rights.  Ex. D at 2:50-5:11.  The encounter was also brief, and while there was some

antagonistic behavior (e.g. Detective MacNamara cutting off Hargraves), there is no evidence in the record of *excessively* coercive behavior, or of special circumstances that would render Hargraves incompetent to consent to a swab. *Id.*

Defendant next contends that officers obtained Hargraves consent fraudulently, by stating that it did not matter to the officers one way or the other whether Hargraves consented to the swab, since the officers would go get a warrant anyway. Ex. D at 2:50-3:00. However, "statements by law enforcement officers suggesting that acquiring a warrant would be a foregone conclusion" only constitute coercion when "probable cause to support the issuance of a warrant is, in fact, lacking." *United States v. Noe*, 342 F. App'x 805, 807 (3d Cir. 2009); *see United States v. Sebetich*, 776 F.2d 412, 424-25 (3d Cir. 1985) ("If indeed that warrant was supported by probable cause, even a statement by Officer Fleming that he could obtain, not merely attempt to obtain, a warrant . . . would not constitute deceit or trickery but only a 'fair and sensible appraisal of the realities.'"). In this case, the Government sought and received a warrant on the only passenger not to consent to a DNA swab (Andre Gershad). Tr. 69:15-70:15. The evidence therefore supports the Government's claim that it would have sought and received a warrant to collect Hargraves' DNA. The Court agrees with Defendant that, by then, Gershad had confessed to ownership of the firearm, whereas Hargraves had not, which is a relevant fact that would have had to be included on any warrant application. Tr. 71:6-20, 121:2-15. However, this fact alone does not defeat the Government's claim that it had probable cause to collect Hargraves' DNA given that Gershad's DNA was not a match for the DNA on the firearm. D.I.33 at 5. When combined with Hargraves' presence in the vehicle and proximity to the weapon, along with the other indicia of criminality, the Court is persuaded that probable cause existed to support the issuance of a warrant for Hargraves' DNA. Accordingly, the Court finds that the officers' statements to Hargraves did not

rise to the level of "deceit or trickery," given the substantial likelihood that officers would have obtained a warrant had they sought to do so. *Sebetich*, 776 F.2d at 425.[5]

Given the above, the Court finds that Hargraves voluntarily consented to the DNA swab by self-swabbing.

## III.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is **DENIED**.  The Court will issue an Order consistent with this Memorandum Opinion.

---

[5] Because there was likely probable cause for the search, and because the Government likely would have sought a warrant, the evidence also likely would have been discovered absent any unconstitutional mechanism.  Thus, the doctrine of inevitable discovery also precludes the suppression of the DNA swab. *Nix v. Williams*, 467 U.S. 443-44 (1984).